J-S11014-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF L.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1239 WDA 2019 |

Appeal from the Decree Entered July 15, 2019
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
O.A. 24 of 2019

BEFORE:  NICHOLS, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                         **FILED: JUNE 8, 2021**

A.M. (Mother) files this appeal from the order granting the petition of the Butler County Children and Youth Agency (the Agency) and involuntarily terminating her parental rights to L.B., born in December 2012 (Child), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1]  This Court previously remanded this matter for Mother's counsel, Nicole L. Thurner (Counsel), to file a new petition to withdraw from representation and an

---

[1] The trial court also terminated the parental rights of J.M.B., Jr. (Natural Father) and D.W.M., Jr. (Presumptive Father).  Neither the natural or presumptive father of Child has filed an appeal nor participated in the present appeal.

amended ***Anders***/***Santiago***[2] brief or an advocate's brief.[3]  Counsel has filed

a new petition to withdraw and an amended ***Anders***/***Santiago*** brief.  For the

reasons that follow, we affirm and grant Counsel leave to withdraw.

The trial court summarized the facts and procedural history of this

appeal as follows:

> The Agency received a referral on June 13, 2017, indicating that
> Mother and Father were residing together and using drugs.  The
> couple had an extensive history of domestic violence.  [The
> Agency] conducted a home visit at residence of Mother and Father
> [(collectively, Parents)].  Neither parent appeared under the
> influence, but appeared to have just woken.  However, the Parents
> were unable to provide a urine screen at that time.  Father agreed
> with and signed the safety plan.  On July 6, 2017, Father called
> the Agency to report that he was at Butler Memorial Hospital
> detoxing from cocaine use, Mother was homeless and using drugs.
> Father informed the agency that he had left the Child in the care
> of [Child's] paternal cousins . . . (the "Kinship [Placement]
> Family").  [Child] was placed on a 30 day safety plan with the
> Kinship Placement Family.  After that, Father had no contact with
> the Agency for some time.  [The Agency] attempted to contact
> Mother multiple times.  On July 24, 2017, Mother contacted the
> Agency and acknowledged that she did not have a residence and
> could not care for [Child].  Mother explained that she was helping
> a friend remodel, had an interview, and was getting a car fixed.
> Just before the safety plan was scheduled to end, Father left the
> hospital.  Mother was believed to be homeless.  She had not met

---

[2] ***Anders v. California***, 386 U.S. 738 (1967); ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009); ***see also In re V.E.***, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending ***Anders*** to appeals in involuntary termination matters).

[3] Counsel filed the notice of appeal docketed at 1239 WDA 2019 on August 19, 2019 from the order granting the petition to terminate her parental rights. She filed the notice of appeal docketed at 1544 WDA 2019 on October 11, 2019 from an order granting a goal change.  Although we previously consolidated these matters for disposition, we now address these appeals separately, as they now present different issues.

with [the Agency] or provided a drug test. [Child] was detained on August 7, 2017, when the safety plan ended as both of her parents were homeless and unable to care for her. Upon her detention, [Child] remained with the Kinship [Placement] Family. Neither Mother nor Father attended the Shelter Care Hearing.

An Adjudication Hearing was held on August 23, 2017, at which time [Child] was adjudicated dependent. Mother attended this hearing in person, while Father attended via telephone. Both Parents placed sufficient admissions on the record to support an adjudication of dependency. Mother also submitted to a drug screen on this day, which was positive.

On September 11, 2017, Mother attended the hearing in person, while Father again attended via telephone. Following the hearing, the [c]ourt concluded that it was in the best interest of [Child] to be removed from Mother's and Father's homes. Visitation was ordered, permitting Mother supervised visits twice per week, and Father supervised visits one every other week. The following objectives were also set for Mother:

- Maintain a legal source of income to meet [Child's] needs;

- Choose healthy relationships with people who are drug -free and safe for [Child] to be around;

- Maintain safe and stable[] housing with utili[t]es that are in working order;

- Attend and actively participate in [Child's] medical, dental, educational and developmental appointments to the best of her ability;

- Participate in weekly drug screens with two random drug screens;

- Schedule and attend drug and alcohol assessment and will notify caseworker the date and time;

- Follow any/all recommendations of the drug and alcohol assessment;

- Participate in mental health assessment of a provider of her choice and follow any recommendations made; and

- Inform her mental health providers that information shall be shared with the Agency and will sign any necessary releases.

\* \* \*

On September 12, 2017, Mother was assessed at [Gaiser]. [Gaiser] recommended that Mother received drug treatment. Mother started, but was unable to attend due to the fact that she was residing in Pittsburgh. Mother requested a referral to another agency. Family Pathways also conducted a mental health assessment on the same day and recommended mental health treatment as well. Mother did enter an inpatient treatment program at Cove Forge in October of 2017. Upon her discharge in November of 2017, Mother moved back to her parents' residence in Butler County. Mother then began intensive outpatient treatment at [Gaiser] providing weekly drug screens while residing with her parents, which were negative. Mother also began receiving Mental Health treatment at the Care Center.

On December 4, 2017, a permanency review hearing was held at which Mother attended . . . . Mother was found to have been in substantial compliance with her permanency plan. She had completed treatment in intensive outpatient treatment at [Gaiser], begun Vivitrol treatments for alcoholism (ultimately, Mother only received 4 treatments before leaving treatment), was living with her parent, and seeking employment. She had generally been providing clean drug screens, though she did have 3 refusals. The [c]ourt found that she had made moderate progress toward alleviating the circumstances which necessitate the original placement. . . .

While living in the highly supportive environment of her parents' home, Mother had been doing very well. Mother secured employment as a Manager at BiLo. She was attending all of the Child's medical and educational appointments. She had also been attending mental health treatment at The Care Center. Mother successfully completed her intensive outpatient treatment with [Gaiser] on February 16, 2017. She was then stepped-down to outpatient treatment. While Mother had been progressing, she experienced a major setback. Mother had a very serious argument with Maternal Grandmother on February 23, 2018, which ended in her being kicked out of the home.

As usual, Mother took no responsibility for her actions and placed the blame on others. Mother alleges that it involved Maternal

Grandmother's refusal not to argue in front of the Child. Maternal Grandmother ultimately kicked Mother out. Mother claims that she was unable to get to work and was fired since Maternal Grandmother provided her transportation to work. Mother explained that because Maternal Grandmother did not help her, she relapsed. Mother was discharged from [Gaiser] and the Care Center shortly thereafter for noncompliance. Rather than turn to the Agency for help, or even inform the Agency of her change in residence, Mother states that she went to Catholic Charities for assistance, but was turned downed. Mother failed to maintain contact with the Child or [the Agency] during this period. With the next hearing looming, she entered Cove Forge again on March 25, 2018.

Mother attended the March 26, 2018 Hearing by telephone. Mother failed to acknowledge that had been discharged from her last IOP [(intensive outpatient program)] with [Gaiser] or the Care Center for non-compliance. Without this information, the [c]ourt gave Mother the benefit of the doubt, concluding that she was in moderate compliance with her plan and had made moderate progress. . . .

Mother had been successfully discharged from Cove Forge on May 30, 2018. Following her discharge, Mother entered the Cove Forge Renewal Center, which is a halfway house for women in recovery. Mother again did very well in this highly supportive environment and visited consistently with [Child].

As of the July 10, 2018 permanency review hearing, the [c]ourt again concluded that Mother was in substantial compliance and had made substantial progress. The court noted that Mother was addressing her drug and alcohol addiction, receiving appropriate treatment, and had maintained her sobriety. Mother's lack of stable housing was the only goal that she had not met at that point.

The next Permanency Review Hearing was held on October 9, 2018. At this point, Mother continued to progress. She was still residing in the Renewal half-way house and [maintaining] her sobriety and mental health treatment. However, she was still working on providing stable housing. Consequently, the [c]ourt concluded that she was in substantial compliance with her permanency plan and had made substantial progress. . . .

\*    \*    \*

Following the December 11, 2018 Permanency Review Hearing, the [c]ourt once more concluded that Mother was in substantial compliance with her permanency plan. While Mother continued to reside in her half-way house, she was compl[ia]nt with her dual diagnosis treatment, attended visitation and actively sought opportunities to better herself through services. Mother's Counselor at Renewal, Kimberly Benna, testified at the hearing that Mother had successfully completed Renewal's program and would be released in a few days. Ms. Benna further testified that Mother . . . would continue care through a dual counseling intensive outpatient program at Alternative Community Resource Program ("ACRP"). Mother's appointment with ACRP had been already made by Renewal. Mother's progress was also found to be substantial for these reasons. Mother's lack of stable housing was the only goal that she had not met at that point. Though, Mother was actively involved in Cove Forge's Renewal program, she was working full-time at a call center. . . .

Mother was successfully discharged from her half-way house at the Renewal Center on December 14, 2018. At that point, Mother moved into an apartment that she found and paid for herself. Mother spoke with [the Agency] on numerous occasions, stating that she would be staying in Johnstown[, Cambria County] area because she had developed a positive support network there. Following her discharge from Renewal, Mother was granted overnight weekend visits with the Child. Transportation of the Child, drug testing and monitoring of the visits was provided by SOS [(Specialty Outreach Services)]. According to SOS, Mother continually tested "negative" and visits with the Child went well.

Clearly, Mother returned to her cycle of struggle following her discharge from the highly structured and supportive environment of the half-way house, though she remained drug-free. Mother asserts that she had significant difficulty finding another program in Johnstown to continue her mental health treatment and drug and alcohol treatment following her release. Mother claims to have called multiple facilities without much success. According to Mother, the facilities all failed to return her calls. Mother specifically stated that she had made numerous phone calls to get into Twin Lakes, but had much difficulty getting a hold of them. She testified that she also relied on friends to call for her. Mother related that a friend finally drove . . . her to Twin Lakes on December 27, 2018, because she could not get a hold of the facility *via* phone. The [c]ourt finds Mother's testimony concerning her alleged difficulty continuing care following

- 6 -

discharge from Renewal not credible. Ms. Benna testified at the previous Permanency Review Hearing that Mother's continuing care was arranged and scheduled at ACRP prior to her discharge from Renewal, Mother simply did not follow through, which is consistent with her pattern of behavior when she is not residing in a high structured and supportive environment.

Mother alleges that she completed an intake at Twin Lakes December 27, 2018. Twin Lakes recommended that she attend their recovery group, but it met during her work hours. Again, Mother provided no documentation concerning this intake to the Agency no[r] the [c]ourt. The [Agency] counselor reached out to Renewal to see what is available as he was not familiar with Cambria County. He also called Twin Lakes, looking for alternatives but did not receive a return call. Renewal was going to compile some options, but [the Agency] never received a list.

Mother claims that she was then laid off from her call center job in January of 2019. However, she never provided any documentation of her employment or subsequent termination of employment. At the time, she was not in any active treatment for drugs and alcohol. Despite claiming that she could not attend Twin Lake's recovery group due to a conflict with her work schedule, Mother chose not to begin any treatment during the three months that she was unemployed.

A Permanency Review Hearing was scheduled for February 15, 2019. However, by consent of all parties, the hearing was continued to May 10, 2019. On March 1, 2019, the Agency filed a Petition for the Involuntary Termination of Parental Rights of [Mother. The trial court appointed Ronald N. Thomas, Esq., Child's dependency guardian *ad litem* (GAL), to represent Child at the termination hearing. The clerk of the court issued a notice to Mother regarding the petition to terminate and the scheduling of a hearing for June 26, 2019. The notice advised Mother that she had a right to counsel if she could not afford one. Neither the record nor the docket contains a petition by Mother seeking appointed counsel for the purpose of the termination hearing.]

Following the filing of the Petition, Mother contacted her [Agency] caseworker on March 21, 2019, claiming to have finally started mental health treatment at ACRP. She claimed to have completed an intake and met with a counselor by the name of Tessa at ACRP, but had not started treatment. However, she failed to provide any treatment records or sign a release. When [the Agency] called

- 7 -

ACRP with whom Mother claimed to be treating, the voice mail system did not include any employee by the name of Tessa. Despite leaving messages on two different occasions, [the Agency] was unsuccessful in making contact with anyone at ACRP to confirm Mother's claims of treatment.

Mother also claimed to have begun a part-time posit[i]on with Giant Eagle. While her hours varied, she stated that she did not work weekends while she had overnight visitations with [Child]. Mother was unaware of any specific dates of her employment. Moreover, Mother has never provided documentation of her employment to the Agency.

On April 5, 2019, an incident occurred where Mother contacted SOS, the entity providing transportation of [Child] and case management in Cambria County, and indicated that she was not available when [Child] was to be dropped off for her weekend visits. Mother asserts that she asked SOS to transfer custody to a friend. SOS contacted the Agency stating that Mother wanted [Child] to be given to her "boyfriend." The Agency stated that this was not acceptable as [the Agency] w[as] completely unaware of who[] this person was. Mother's casework[er] then testified that he received a follow up call from SOS stating that the issue had been resolved, with no further information. The SOS represent[ative], and Mother testified that she believed, that [the Agency] had stated that SOS could release [Child] to a female caregiver of Mother's choosing, with no additional clearances or information needed, so long as the Caregiver provided identification to SOS. The court specifically found this testimony lacked credibility. Despite knowing that she needed to provide drug testing, she did not believe this would be necessary of her caregiver despite the fact that the caregiver was also in recovery. Mother does not dispute that she never informed the Agency that she would be working during [Child's] visit, despite speaking with her caseworker regularly.[4]

On May 10, 2019, the final Permanency Review Hearing was held. Mother testified during that hearing that she was working two jobs. She had recently secured a new full-time job at a call center

_____

4 As noted by the trial court, Corri Dunn, Esq., and Andrea Boyle, Esq., represented Mother in the dependency proceeding from August 8, 2017, to February 2019. The trial court appointed Counsel for Mother on February 5, 2019.

and was still working at Giant Eagle on the weekends. Again, she failed to provide any documentation. Consequently, she claimed to be working during her overnight visitation with [Child]. However, Mother did not inform the Agency that she would be working, nor did she inform the Agency who would be caring for the Child during this time. The caregiver(s) chosen by Mother was not known to nor cleared by the Agency. Furthermore, Mother had failed to provide any documentation of any mental health or drug and alcohol treatment since her discharge from Renewal. Given the safety concerns following Mother's decision to leave the Child with a caregiver unknown to the Agency, Mother's visitations were reduced from overnights to weekly six-hour visits.

On June 10, 2019, Mother was incarcerated for a violation of house arrest. At no point prior to this day did Mother inform the Agency of the charges pending against her or the fact that she had pled guilty to the charges.[fn1] Mother violated the terms [of her house arrest] by failing to communicate with the Cambria County Probation office on numerous occasions. According to Mother, it was again someone else's fault. This time it was the Cambria County Office of Probation and Parole that failed to return her phone calls. It is important to note that despite being in contact with the Agency, SOS, and the [c]ourt [in the instant matter], she did not seek assistance in attempting to contact her Parole officer.

> [fn1] Mother's current incarceration arose from a guilty plea in August of 2018, arising out of . . . separate [driving under the influence] charges in late 2017. Pursuant to that plea, Mother was sentenced to 6 months of Intermediate[ ] Punishment, which involved 42 days of house arrest followed by restorative sanctions. According to her plea, Mother had 30 days to arrange for her house arrest through Cambria County. Mother failed to do so. Consequently, on June 14, 2019, she was incarcerated in the Butler County Jail with a sentence of 32 days to 1 year. She is expected to be released on July 15, 2019, with the remainder of her sentence to be served through parole.

Trial Ct. Findings of Fact, Op. & Order, 7/15/19, at 1-12.

The trial court held a hearing on the termination petition on June 26, 2019. At the beginning of the hearing, Counsel requested a continuance

noting that the trial court had not formally appointed her as Mother's termination of parental rights counsel and that Mother was currently incarcerated. N.T., 6/26/19, at 12. Following a discussion with the trial court, Counsel represented that she was prepared and asked the court to appoint her as Mother's counsel for the termination hearing.[5] *Id.* at 13.

The Agency presented testimony from (1) Mother's probation officer, Gregory Bowers, (2) Agency caseworkers Tanya Montgomery, Serena Johnston, and Matthew Duncan, (3) Agency casework supervisors Rochelle Graham and Nicole Burdett, and (4) Maggie Lynn Kerry, who provided child preparation services at Family Pathways, (5) Patricia Duare, a supervisor with the Bair Foundation, and (6) a psychologist, Bruce Chambers, Ph.D. Mother testified on her own behalf and presented testimony from Brenda Alter of SOS. Attorney Thomas, Child's GAL, represented Child at the termination hearing.

By the decree entered on July 15, 2019, the trial court involuntarily terminated Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Mother timely filed the instant appeal at 1239 WDA 2019 and statement of concise errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive Rule 1925(a) opinion.

Counsel originally filed a petition to withdraw and an ***Anders*/*Santiago*** brief in each appeal. This Court denied Counsel's petitions to withdraw, finding

---

[5] The trial court did not enter a separate order appointing Counsel to represent Mother as termination of parental rights counsel.

that Counsel's letters to Mother were confusing as to when Mother could respond *pro se* or with new counsel to Counsel's request to withdraw. *In re L.B.*, 1239 & 1544 WDA 2019, at 6-7 (Pa. Super. filed May 11, 2020) (unpublished mem.). We further noted, in relevant part, that Counsel's *Anders*/*Santiago* briefs did not discuss possible termination of parental rights issues regarding Child's right to counsel as set forth in *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017), or Section 2511(b). *Id.* at 11. This Court struck the original *Anders*/*Santiago* briefs and remanded the matter to the trial court for Counsel to file advocates' briefs or new petitions to withdraw along with amended *Anders*/*Santiago* briefs.

On June 30, 2020, the trial court issued an addendum to its Rule 1925(a) opinion. Therein, the trial court concluded that Mother failed to preserve a challenge to Child's counsel under *L.B.M.* and that, in any event, her claim did not warrant relief. Trial Ct. Op.—Addendum, 6/30/20, at 5.

Counsel filed a new petition to withdraw and a new *Anders*/*Santiago* brief. *Id.* Neither the Agency nor Child's counsel filed briefs prior to remand, and they have not filed any response to Counsel's amended *Anders*/*Santiago* briefs. Similarly, Mother has not responded to Counsel's original or amended *Anders*/*Santiago* brief either *pro se* or through new counsel.

In her present *Anders*/*Santiago* brief, Counsel notes that upon Mother's request, she originally filed a notice of appeal and a concise statement of errors complained of on appeal. Am. *Anders*/*Santiago* Brief,

1239 WDA 2019, at 10.  Counsel now summarizes her issues from her original

Rule 1925(b) statement, which we have reordered as follows:

> (1) Failure of the [GAL] to Fully and Faithfully Investigate;[6]
>
> (2) Failure to Timely Appoint Counsel in Violation of Due Process Rights;
>
> (3) Failure to Meet Burden of Proof under 23 Pa.C.S. § 2511(a);
>
> (4) Cursory and Unsupported Analysis under 23 Pa.C.S. § 2511(b);
>
> (5) Failure to Make Findings of Fact as to the Nature and Strength of the Bond and Relationship of the Child with the Parents or Guardians; [and]
>
> (6) Failure to Feasibly or Adequately Provide [Mother] with Services Necessary to Complete her Tasks and Objectives[.]

---

[6] As we noted in our previous decision, Counsel's Rule 1925(b) statement included the following claim:

> The [GAL] failed to fully and faithfully investigate all relevant witnesses and documents and as such her report to the [trial] court was wholly inadequate and did not provide a solid basis for the [trial] court to render any reasonable decision.  The [GAL] did not meet with [Mother] nor did she interview any of [Mother's] family to determine whether or not a relationship exists between [Child] and [Mother] and [Mother's] family. **The [GAL] met with [Child] on one occasion prior to the hearing and did not present any supporting witnesses or documents for the [trial] court to support h[is] findings**.  As is such, the [GAL] **failed to fully and faithfully investigate and was unable to provide the [trial] court with any relevant information** for the [trial] court to wholly and adequately make its decision and therefore its decision should be reversed.

Rule 1925(b) Statement, 1239 WDA 2019, 8/19/19, at 4 (unpaginated) (some formatting altered) (emphases added).

*See id.* (some formatting altered). Counsel concludes that these issues are without merit and wholly unsupported by the record. *Id.* Further, although this Court previously identified an issue concerning Child's right to legal counsel , Counsel has not  discussed that issue in her *Anders*/*Santiago* brief.

**General Standard of Review**

When faced with an *Anders/Santiago* brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw. *See In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). As this Court has stated:

> To withdraw pursuant to *Anders*, counsel must:
>
> > 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.
>
> With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."

*In re J.D.H.*, 171 A.3d at 903, 907 (Pa. Super. 2017) (citations omitted). Additionally, counsel must file a brief that meets the following requirements established by the Pennsylvania Supreme Court in *Santiago*:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;

>(3) set forth counsel's conclusion that the appeal is frivolous; and

>(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*In re Adoption of M.C.F.*, 230 A.3d 1217, 1219 (Pa. Super. 2020) (citation omitted).

"After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted). Our independent review is not limited to the issues discussed by counsel, but extends to "additional, non-frivolous issues" that may have been overlooked by counsel. *J.D.H.*, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it lacks any basis in law or fact. *See M.C.F.*, 230 A.3d at 1220; *accord Santiago*, 978 A.2d at 355.

Here, following remand, Counsel has complied with the *Anders*/*Santiago* procedures by filing a petition to withdraw and supplying Mother with a copy of the *Anders*/*Santiago* brief and a letter explaining Mother's appellate rights. Ex. A to Counsel's Mots. to Withdraw, 6/29/20, at 1 (informing Mother "[y]ou have the right to retain new counsel, proceed *pro se* or raise any additional points that you deem worthy of the court's attention. Should you decide to proceed, you must do so quickly"). Moreover, Counsel's brief includes a summary of the relevant facts and procedural history, and

Counsel explains her reasons for concluding that the issues preserved in the Rule 1925(b) statement lack merit. Because Counsel has complied with the procedural requirements to withdraw, we proceed to an independent review of whether the issues raised lack merit. *See S.M.B.*, 856 A.2d at 1237-38.

### 1. Child's Right to Counsel

In the first issue identified by Counsel, Counsel states that "[i]n the termination of parental rights case, there was no [GAL] appointed, but rather counsel for [Child]. Pursuant to 23 Pa.C.S.[] § 2511, there is no requirement of the child's counsel or [GAL] to investigate." Am. *Anders*/*Santiago* Brief at 17. Although this Court previously identified possible issues concerning Child's right to legal counsel in a termination of parental rights proceeding, Counsel provides no further discussion in response to our prior decision.

However, the trial court, in its addendum to its Rule 1925(a) opinion, directly addresses the issue of Child's right to counsel. Specifically, the trial court discusses: (1) *L.B.M.*, (2) the *Pennsylvania Dependency Benchbook* as it pertains to evidence of a Section 2511(b) analysis and considering a child's preferences during permanency review hearings, (3) the statutory provisions concerning a child's consent to adoption, and (4) the Rules of Professional Conduct governing the confidentiality of information. Trial Ct. Op.— Addendum, at 1-3 (unpaginated). Additionally, the trial court refers to the ethical obligation of a child's attorney to disclose potential conflicts of interest. *Id.* at 3. The trial court concludes that "it is not appropriate for the trial court

to demand [a] child's counsel to place the child's preference on the record in a [termination of parental rights] case." *Id.*

The trial court emphasizes that in the instant case, it appointed Attorney Thomas as Child's counsel in the termination proceeding. *Id.* at 1. The trial court asserts that there was no conflict between Child's legal and best interests. *Id.* at 2. The trial court notes that no party raised a potential conflict between Attorney Thomas acting as GAL in the dependency proceeding and as Child's counsel in the termination proceeding, and that Mother did not raise the issue on appeal. *Id.* at 5. The trial court concludes that it appropriately considered Child's preferences during the dependency proceeding, and it "knew of no conflict which would prevent [the GAL] from advancing Child's legal interests" at the termination of parental rights hearing. *Id.*

### Background to Child's Right to Counsel

Section 2313(a) states:

> **(a) Child.—**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S. § 2313(a).

Our Supreme Court, in *L.B.M.*, considered whether Section 2313(a), "which mandates the appointment of counsel for children involved in contested

involuntary termination of parental rights . . . proceedings, is satisfied by the appointment of a [GAL] provided that the GAL is an attorney." *L.B.M.*, 161 A.3d at 174. In *L.B.M.*,

> a majority of the Court agreed on several points: (a) in the context of contested termination-of-parental rights . . . proceedings, the first sentence of Section 2313(a) requires that the common pleas court appoint an attorney to represent the child's legal interests, *i.e.*, the child's preferred outcome; (b) where there is a conflict between the child's legal interests and his best interests, [a GAL], who advocates for the child's best interests, cannot simultaneously represent the child's legal interests; and (c) in such a circumstance, the failure to appoint a separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to a harmless-error analysis.

*In re T.S.*, 192 A.3d 1080, 1082 (Pa. 2018) (footnotes omitted). The *L.B.M.* Court noted the definitions of best and legal interests in the comment to Pa.R.J.C.P. 1154, which read:

> "Legal interests" denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation. "Best interests" denotes that a [GAL] is to express what the [GAL] believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees.

*L.B.M.*, 161 A.3d at 175 n.2 (citation omitted).

In *T.S.*, our Supreme Court initially explained that a challenge to the trial court's failure to appoint counsel to represent the children's legal interests was not subject to waiver and that a party could raise it for the first time on

appeal.[7]  *Id.* at 1087.  Our Supreme Court held that the trial court did not err in allowing the children's GAL to act as the children's counsel during the termination of parental rights proceeding because, at two and three years old, the children were incapable of expressing their preferred outcome.  *Id.* at 1089, 1092.  The Court explained that Section 2313(a) was satisfied by the representation of the children by the GAL because "if the preferred outcome of [the children are] incapable of ascertainment because [they are] very young and pre-verbal, [then] there can be no conflict between the [children's] legal interests and his or her best interests."  *Id.* at 1092-93.  The Court further stated that "where there is no conflict between a child's legal and best interests, [a GAL] representing the child's best interests can also represent the child's legal interests."  *Id.* at 1092.

In *In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020), our Supreme Court then held that while an appellate court may "verify that the orphans' court appointed counsel to represent [a] child's legal interest, it may not assess *sua sponte* the performance of that representation."  *K.M.G.*, 240 A.3d at 1224.  The High Court reasoned that *sua sponte* verification of whether the orphan's court appointed counsel to represent a child's legal interest involves

---

[7] Although a parent has standing to challenge a violation of Section 2313(a) on behalf of a child, the right to counsel under Section 2313(a) belongs to the child.  *See T.S.*, 192 A.3d at 1087.  The non-waivable right to legal counsel in a termination of parental rights proceeding has not been expressly extended to dependency matters.

relatively straightforward issues determinable from the face of the record. *Id.* at 1236.

The *K.M.G.* Court specifically concluded that when the issue of a child's right to counsel is not raised by a party, this verification requires an appellate court to consider: "(1) whether the orphans' court appointed counsel to represent the legal interests of the children and (2) if the appointed counsel also serves as GAL, **whether the orphans' court** determined that the child's best interests and legal interests did not conflict." *Id.* at 1239 (emphasis added). The Court emphasized that this verification "does not involve second-guessing whether GAL/Counsel in fact had a conflict . . . but solely whether the orphans' court made the determination in the first instance." *Id.* at 1235. The Court noted that "this limited review strikes an appropriate balance between protecting children who cannot assert their own right to counsel, while insuring the least disruption to 'the process of orderly judicial decision making' in termination proceedings." *Id.* at 1236.

Conversely, the *K.M.G.* Court held that an appellate may **not** review *sua sponte* whether a child's legal counsel, who also served as GAL, had a conflict when representing a child's legal and best interests. *Id.* at 1236. The Court reasoned:

> The determination of whether a conflict exists does not necessarily result in a yes or no answer but involves a nuanced determination. Indeed, both the attorney's view of the child's best interests and the child's preferred outcome likely lie, somewhat nebulously, on a continuum between strongly favoring termination and strongly disfavoring termination. **It is not for an appellate court to determine how closely the interests must align or overlap**

> **to negate the existence of a conflict. We are especially hesitant to have appellate courts reweigh an orphans' court's determination that the interests do not conflict, where the orphans' court has witnessed the parties over the course of the dependency and termination proceedings and is presumably aware of the relationship formed between the GAL/Counsel and the children**.
>
> . . . Unlike the appointment of legal counsel, the potential conflict of interest in a GAL/Counsel's representation of a child is not something that appellate courts should review *sua sponte*, without the benefit of appellate advocacy.

*Id.* at 1236-37 (citation omitted) (emphasis added).

The *K.M.G.* Court also refused to permit *sua sponte* review of whether legal counsel effectively advocated for a child's legal interest at a termination hearing, reasoning that Section 2313(a) spoke only to the appointment of counsel. *Id.* at 1237. The High Court specifically expressly rejected an assumption that the "absence of a child's preference on the record" demonstrated counsel's failure to ascertain a child's legal interest. *Id.* at 1237. The *K.M.G.* Court explained:

> While we recognize that it may be a best practice for a child's legal counsel to divulge the child's preferences in order to advocate for their client's preferred outcome, we find nothing in the language of the Adoption Act requiring that their preference be placed on the record, which instead only requires that the child be appointed counsel. Moreover, we observe that the child's legal counsel has a duty of confidentiality to their client, the child, such that they should not be compelled to disclose the child's preferences. We are thus wary to create a bright-line rule requiring counsel and the courts to place [a child's] preferred outcome on the record as we are concerned by both the potential violation of a child's attorney-client privilege and with the real specter of placing unconscionable stress on a child by mandating that her feelings regarding her parents and caretakers be made public and permanently enshrined in the record.

- 20 -

> Instead, we leave the decision of whether to place the child's preference on the record to the child's counsel based upon counsel's legal determinations in representing his client, as well as the orphans' court which has often witnessed the child, relevant family members, and other stakeholders through months of hearings, sitting as both the juvenile court and orphans' court. Accordingly, we reject *sua sponte* review of whether counsel placed the child's interest on the record.

*Id.* at 1237-38 (citation omitted).

Relatedly, in *In re P.G.F.*, 247 A.3d 955 (Pa. 2021), our Supreme Court considered "whether an attorney could act as both [GAL] and legal counsel for a minor child, where legal counsel failed to expressly inquire into the child's preferred outcome of a termination proceeding." *P.G.F.*, 247 A.3d at 961. In *P.G.F.*, this Court initially raised the issue of a conflict *sua sponte* and remanded, in part, for the child's counsel to ascertain the child's preferred outcome. *Id.* at 960. On remand to the trial court, child's counsel asserted that she consulted with the child, that the child wanted to remain with the mother, who was seeking the termination of the biological father's parental rights, and that the child was not familiar with the biological father. *Id.* This Court subsequently affirmed the order terminating the father's parental rights, noting, in relevant part, that the record supported the trial court's determination that the child's legal and best interests did not conflict and that child's counsel properly discharged her duties. *Id.* at 960-61.

The High Court in *P.G.F.* affirmed this Court. Specifically, the *P.G.F.* Court set forth additional guidance for counsel to discern a child's legal interests and for the trial court to determine whether counsel "fulfilled his

obligations" to a child. *Id.* at 966-67. The ***P.G.F.*** Court noted that while

***K.M.G.*** was not controlling because that case involved the scope of *sua sponte*

review, ***K.M.G.*** provided "significant considerations" informing its decision.[8]

Citing ***K.M.G.***, the ***P.G.F.*** Court reiterated that "significant deference must be

accorded to counsel's approach in discerning a child's preferences and the

child's articulation thereof." *Id.* The Court concluded that an appellate court

must give substantial deference to the trial court's "determination regarding

whether the interests of legal counsel and [GAL] conflict, especially where the

court has witnessed the parties during numerous proceedings." *Id.* at 961

n.4, 967.

_____

[8] The ***P.G.F.*** Court also noted that the facts before it presented "unique circumstances." ***P.G.F.***, 247 A.3d at 959. In ***P.G.F.***, the father had limited contact with the child. *Id.* The father moved out of the home when the child was two months old and only personally exercised custody on alternate weekends for six to eight months when the child was around three years old. The mother and her new husband filed a petition to terminate the father's parental rights when the child was five years old.

The trial court appointed one attorney as GAL and legal counsel and, following several hearings, terminated the father's parental rights. *Id.* Following the *sua sponte* remand by this Court, the child's GAL/counsel reported that (1) she consulted with the child, (2) the child identified the stepfather as his father, (3) the prospect of not living with his mother and stepfather upset the child, and (4) child did not recall spending time with the father and did not recognize the father's name. *Id.* at 960. The trial court found no conflict existed between the child's best and legal interests and re-entered its order terminating the father's parental rights. *Id.* In the appeal before our Supreme Court, the father asserted that GAL/counsel's consultation with the child was inadequate, in part, because GAL/counsel did not directly inquire as to whether the child wanted the father's parental rights to be terminated. *Id.* at 961. Therefore, the father asserted that the trial court erred in finding no conflict in the child's interests. *Id.* at 962.

### *Sua Sponte* Review and Independent Review under *Anders*

The present case is in a different procedural posture than the matters

at issue in ***L.B.M.***, ***T.S.***, ***K.M.G.***, and ***P.G.F.***  Here, Counsel has filed a petition

for leave to withdraw and filed an ***Anders*** brief.

As noted above, in the ***Anders*** context, this Court's case law requires

an independent review, which this Court explained as follows:[9]

> "[P]art and parcel of ***Anders*** is our Court's duty to review the record to insure no issues of arguable merit have been missed or misstated."  This view comports with the main purpose of ***Anders***, which is to make sure that an appellant is provided with adequate counsel as required by the Sixth Amendment of the U.S. Constitution.  Ultimately, our Court's overriding task is to ensure that a criminal defendant's loss of liberty is reviewed with the gravity to which it is entitled.  When counsel seeks to withdraw, ***Anders*** requires nothing less.
>
> In light of the constitutional rights at issue, we must give ***Anders*** a most generous reading and review "the case" as presented in the entire record with consideration first of issues raised by counsel. . . . [T]his review does not require this Court to act as counsel or otherwise advocate on behalf of a party.  Rather, it requires us only to conduct a review of the record to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated.  We need not analyze those issues of arguable merit; just identify them, deny the motion to withdraw, and order counsel to analyze them.

***Commonwealth v. Yorgey***, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en*

*banc*) (citations omitted).  The same principles of independent review apply

to cases involving the termination of parental rights.  ***See M.C.F.***, 230 A.3d

---

[9] Our Supreme Court has yet to directly consider the precise scope of this independent review in the ***Anders*** context.

at 1219-20 (raising an issue not identified by *Anders* counsel in a termination of parental rights case). *Cf. In re J.T.*, 983 A.2d 771, 774 (Pa. Super. 2009) (noting that our Supreme Court recognized the unique nature of termination of parental rights cases and held that an indigent parent has a constitutional right to counsel).

It is clear that *sua sponte* review pursuant to *K.M.G.* and independent review in the *Anders* context both require that this Court "verify if the trial court appointed legal counsel" as required by Section 2313(a), even if the issue was not raised by counsel. However, there is tension between the appropriate scope of *sua sponte* review authorized by *K.M.G.*, and independent review in the *Anders* context, particularly on the issues of whether a child's appointed legal counsel had a conflict of interest and adequately represented a child's preferred outcome in a termination proceeding.

However, *sua sponte* review under *K.M.G.* strikes a balance for an appellate court's role in ensuring a child's right to legal counsel in a termination proceeding. The *Anders* process strikes a balance between a party's constitutional right to appellate counsel and a frivolous appeal. *See Yorgey*, 188 A.3d at 1197. Because a parent may challenge whether GAL/legal counsel labored under a conflict for the first time on appeal, we conclude that independent review in the *Anders* context must include a review of the record to determine whether *Anders* counsel "missed or misstated" an issue that a conflict existed. *See id.*; *J.D.H.*, 171 A.3d at 908.

Although we conclude that independent review includes a review of the record for the existence of a conflict, we remain bound by the principle that this Court must not act as a party's counsel or advocate guides independent review. **See Yorgey**, 188 A.3d 1190, 1197. Further, our Supreme Court, in **K.M.G.** and **P.G.F.**, cautioned that issues regarding the existence of a conflict and meaningful representation are fact-sensitive and require nuanced determinations made by counsel and the trial court. **See P.G.F.**, 247 A.3d 960-61; **K.M.G.**, 240 A.3d at 1236-37. Our Supreme Court also disfavors bright-line rules when reviewing the record for the existence of a conflict and appropriateness of counsel's representation of a child. **See P.G.F.**, 247 A.3d 960-61; **K.M.G.**, 240 A.3d at 1237-38. If the trial court opines on these issues, this Court must afford the trial court's opinion substantial deference. **See P.G.F.**, 247 A.3d at 966-67.

## Application

Turning to issue of Child's right to legal counsel in the present case, we first note that the record shows that the trial court appointed Attorney Thomas, Child's GAL in dependency, to represent Child's legal interests. Further, the trial court made a determination that there was no conflict between Child's best interests and legal interests. Therefore, *sua sponte* verification under **K.M.G.** confirms the trial court's appointment of counsel in a termination proceeding. **K.M.G.**, 240 A.3d at 1224.

Second, for the reasons stated herein, we must conduct an independent review of the record to determine whether there is a non-frivolous issue as to

whether Attorney Thomas had a conflict of interest. We reiterate, however, that the "substantially deferential" standard of review discussed by our Supreme Court requires us to "accept the findings of fact and credibility determinations of the trial court if they are supported by the record" and "determine if the trial court made an error of law or abused its discretion." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted and formatting altered), *cited with approval in* *K.M.G.*, 240 A.3d at 1236, 1238; *see also* *P.G.F.*, 247 A.3d at 965. Notably, "the trial court's decision . . . should not be reversed merely because the record would support a different result" and this Court must defer to the trial court's first-hand observations of the parties spanning multiple hearings." *Id.*

Instantly, an independent review of the record reveals the following. Child was six-years-old at the time of the hearing. Ms. Kerry, who provided child preparation services for Child, described Child as "very social," and being able to "fully communicate." N.T. at 99. Ms. Kerry testified that on May 10, 2019, approximately one month before the termination of parental rights hearing, she met with Child during a permanency review hearing. *Id.* at 94, 96. According to Ms. Kerry, Child stated that "she wanted to go home." *Id.* at 94. However, after Mr. Duncan, the Agency caseworker, spoke with Child, Ms. Kerry noted that "[Child] just seemed a little confused again." *Id.* Ms. Kerry explained that Child "did go from wanting to go home with [Mother] to feeling -- I'm trying to think of the best way to explain this. [Child] didn't appear to exhibit any sort of distress with the visits [with Mother] being

decreased." *Id.* at 96. Additionally, there was evidence that Child bonded with her kinship placement family. *Id.* at 121, 140-41, 180-82.

At the termination hearing, Attorney Thomas did not state Child's preference on the record. Moreover, he did not detail whether and when he consulted with Child as legal counsel for the termination proceeding. However, Attorney Thomas advocated in favor of termination of parental rights. *Id.* at 266 (indicating that as GAL, he believed that Child's placement was appropriate and that as "counsel" it was his position that Child "is where she needs to be and the proceeding should come to a conclusion" with the termination of Mother's and Father's parental rights).

Following our independent review, and mindful of the deferential standard of review set forth by our Supreme Court, the record does not support a challenge to the appropriateness of the trial court's appointment of GAL as legal counsel. We emphasize that despite "best practices," our Supreme Court has confirmed that Attorney Thomas, as Child's counsel, was not required to expressly state Child's preferences at a termination hearing. *See K.M.G.*, 240 A.3d at 1237 (noting that there is "nothing in the language of the Adoption Act requiring that [a child's] preference be placed on the record, which instead only requires that the child be appointed counsel"). Critically, our Supreme Court "rejected any assumption that the absence of a child's preference stated on the record equated to counsel's failure to ascertain the child's preferred outcome or to provide effective representation of the child." *See P.G.F.*, 247 A.3d at 965.

The record here contains some evidence that Child may have had a divergent preferred outcome **prior** to the termination hearing and that Child has a bond with Mother. However, there is also some record support for the trial court's determination that there was no actual conflict between Child's best and legal interests at the time of legal counsel's appointment and representation at the termination hearing, in that Child was also bonded with her kinship care family, expressed wishes to remain with them, and looked to them for comfort and affection. Moreover, the record contains no evidence that Child expressed an interest to go home with Mother after May 10, 2019.

Therefore, our Supreme Court's recent case law compels the conclusion that the trial court's appointment of GAL as legal counsel was appropriate. Accordingly, and notwithstanding Counsel's failure to address this issue in any meaningful fashion, we are constrained to conclude that any possible conflict here does not rise to the level of a non-frivolous issue based on the evolving principles surrounding Child's right to legal counsel under Section 2313.

### 2. Mother's Right to Counsel

In the next issue identified by Counsel, Mother intends to challenge the trial court's failure to timely appoint counsel on her behalf prior to the termination hearing. Counsel asserts that this claim is frivolous because the trial court appointed her as Mother's counsel during the dependency proceedings and she was prepared to proceed as Mother's counsel at the termination hearing.

Section 2313(a.1) states:

> **(a.1) Parent.**—The court shall appoint counsel for a parent whose rights are subject to termination in an involuntary termination proceeding if, upon petition of the parent, the court determines that the parent is unable to pay for counsel or if payment would result in substantial financial hardship.

23 Pa.C.S. § 2313(a.1).

> This Court has stated:

> Parents in involuntary termination proceedings have a constitutionally-protected right to counsel. This Court has held that trial courts need not appoint counsel for indigent parents automatically. However, courts must advise parents of their right to petition for counsel. A parent waives his or her right to counsel if he or she is provided with clear instructions on how to petition for counsel, but fails to take action.

*In re Adoption of C.A.S.*, 166 A.3d 353, 356 (Pa. Super. 2017) (citations omitted).

Instantly, the record confirms that the trial court appointed Counsel to represent Mother in the dependency proceedings. The Agency's petition to terminate Mother's parental rights provided notice of her right to counsel in the termination proceeding. Mother, however, took no affirmative action to request the appointment of counsel. Instead, as indicated by the trial court, Counsel requested a continuance and an appointment on Mother's behalf six days before the scheduled hearing. However, the trial court declined to rule on the motion because Attorney Thomas, Child's GAL, was not present.

At the beginning of the termination hearing, the following exchange occurred:

> [Counsel]: I attempted to present a Motion for a Continuance on last Thursday due to Mother's incarceration.

- 29 -

THE COURT: It would have been denied.

[Counsel]: And -- thank you. But I just need to make a record, if that's okay. She was incarcerated for a probation violation. She's only there for 30 days. The Agency was under the impression she was there for six months. On top of that, I would have requested [to] be appointed on the [termination] case. I am not appointed on that at this time. So, I did want to present a Motion for a Continuance on this matter at this point in time just due to the fact that she is incarcerated. She will be released on July 15th.

THE COURT: First of all, I understand the reason why you could not present the motion last Thursday because I didn't have the [GAL] present. Secondly, there will be no continuances. Regardless of [Father's availability] on the phone, we are proceeding with the hearing today. We are not continuing it. Everybody will just have to deal with the legal issues.

. . . [to Counsel], if you are prepared to proceed on the [the termination petition] today and you wish to be appointed since your client is incarcerated, I will appoint you on that. But I would not grant a continuance for you to prepare if you are not. So, if you don't feel prepared, then, you know, if that is something you want to talk to your client about or you want to make a decision on, that's fine.

[Counsel]: I think I'm prepared. We had that discussion yesterday. And, so, I would just ask the [c]ourt to appoint me.

N.T. at 11-13.

Following our review, we discern no basis to challenge the trial court's rulings. Mother did not request counsel for the termination proceeding, despite having had counsel throughout the dependency proceeding and having notice of both the termination hearing and her right to appointed counsel. Rather, Counsel initiated the process of appointment six days before the scheduled termination hearing. Counsel further represented that she was

prepared to represent Mother regarding the termination matter and sought a continuance based on Mother's incarceration at the time. Therefore, we agree with Counsel that this claim lacks any support in the record or the law.

### 3. Termination of Parental Rights Issues

The final issues identified by Counsel focus on the trial court's decisions concerning the termination of Mother's parental rights under Section 2511(a)(1), (2), (3), (5), and (8) and (b). Although initially listed as four issues in her Rule 1925(b) statement, Counsel discusses three major points,[10] focusing on Section 2511(a), Section 2511(b), and the adequacy of the Agency's reunification efforts.

First, as to Section 2511(a), Counsel notes:

> At the time [C]hild was adjudicated dependent, Mother was battling her addiction and mental health. Mother was incarcerated on at least two separate occasions through the duration of this case, most notably and recently in June 2019. Mother sought treatment on several occasions for her mental health and sobriety and completed her treatment successfully on at least two occasions. However, Mother's follow through once she was discharged from Cove Forge was lacking, most particularly as it pertains to her mental health. The record supports the trial courts finding that Mother did not show an ability to remedy the circumstances that necessitated placement of the child and thus Mother's claim to the contrary is without merit and frivolous to bring before this Court.

Am. ***Anders***/***Santiago*** Brief at 15.

---

[10] It appears that Counsel, in her amended ***Anders***/***Santiago*** brief, combined her discussion of two of her claims set forth in her Rule 1925(b) statement. ***See*** Am. ***Anders***/***Santiago*** Brief at 15.

Second, as to Section 2511(b), Counsel states that Mother's intended challenge to the trial court's failure to consider the nature and the strength of the bonds and relationships among her and the kinship placement family is frivolous. Counsel notes that Dr. Chambers conducted a bonding assessment and found that Mother and Child were bonded, but concluded that the "the risk to [C]hild of being unsafe, unstable and not having permanency outweighed the bond between Mother and [C]hild." *Id.* at 17. Counsel further notes that the "[t]he trial court adequately made findings of fact as to the nature and strength of the bond and relationship between [C]hild and Mother as well as [C]hild and the kinship provider." *Id.*

Third, as to the adequacy of the Agency's provision of services, Counsel notes that "Mother never requested assistance from CYS to obtain her mental health treatment, help in scheduling any mental health appointments or assessments, nor did Mother request any additional services to help address her mental health." *Id.* at 15.

### Standard of Review

As noted above, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***T.S.M.***, 71 A.3d at 267 (citations omitted).

Termination requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We focus our analysis on subsections (a)(2) and (b).

## **Section 2511(a)(2)**

Section 2511(a)(2) and (b) provide:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **In Interest of Lilley**, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. **In re Z.P.**, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. **Id.**

Instantly, the trial court explained its decision concerning Section 2511(a)(2) as follows:

> Child was initially adjudicated dependent, in part, due to Mother's refusal to provide Child with essential parental care, control, or subsistence necessary for [Child's] physical and mental well-being. The record evidence established by clear and convincing evidence that while Mother had made some progress while residing in highly structured and supportive environments, she has not provided parental care, control, or subsistence necessary for . . . Child's physical or mental well-being while residing out of those environments. Mother continues to make decisions detrimental to her own best-interests, which has resulted in her complete inability to provide any stability. Despite having many opportunities to do so, she has not adequately addressed her mental health or continued the necessary drug and alcohol treatment to remain sober. Moreover, she still lacks employment and the complete ability to care for and provide for . . . Child now that she is incarcerated due to the fact that she simply failed to contact the appropriate Probation and Parole Office. Therefore, the conditions and causes of Mother's incapacity, neglect or refusal cannot or will not be remedied by her and continue to exist.

*See* Trial Ct. Op., 7/15/19, at 17.

Ms. Montgomery, an intake caseworker for the Agency, handled the initial referral due to parents' drug use, including intake, and conducted the initial home visit in June 2017. N.T. at 32-34. Ms. Montgomery could not make contact with Mother until July 2017, at which point she advised Mother of Child's placement and safety plan. *Id.* at 35. Mother stated that she could not take care of Child at that time. *Id.* At that time, Mother was homeless and could not provide a urine screen. *Id.* at 36. In August 2017, Mother provided Ms. Montgomery an address in Pittsburgh where she was living with a friend, but again fell out of contact. *Id.* at 40-41.

Mother's reunification goals were to maintain stable housing and income, attend drug and alcohol treatment, attend mental health treatment, participate in Child's medical appointments when necessary, maintain "healthy relationships with individuals to be around [Child]," and attend drug screening a minimum of once per week. *Id.* at 44, 100. Mother successfully completed inpatient treatment from October 2017 through November 2017 and moved in with her mother (Maternal Grandmother). Mother completed intensive outpatient drug and alcohol treatment beginning in November 2017, and was stepped down to outpatient in February 2018. *Id.* at 102-04.

However, Mother was discharged for noncompliance in February 2018, had a positive screen in March 2018, and fell out of contact with caseworkers and providers. *Id.* at 102-05. Mother was also kicked out of her home by Maternal Grandmother in March 2018. *Id.* As a result of Mother's setbacks

in early 2018, the Agency reassessed her and returned her to "square one" in terms of reunification. *Id.* at 107.

Mother reentered inpatient treatment from March 2018 through June 2018. *Id.* at 102-05. During that time, case management services were still available to Mother, but she did not utilize them, nor did Mother visit with Child. *Id.* at 106. Ms. Graham, an Agency casework supervisor, testified that during the fall of 2018, Mother was participating in treatment programming, working with staff to get an apartment, and attending supervised visits with Child. *Id.* at 51-52, 83. During a December 2018 hearing, Mother had been employed for several months and was moving into an apartment, but did not provide a copy of the lease. *Id.* at 83. Ms. Graham testified that the Agency would conduct a home safety check so Child could begin in-home visits. *Id.* at 84.

Ms. Burdett, an Agency casework supervisor, testified that Mother did not follow up after the December 2018 hearing, and she had Cambria County Children and Youth Services complete a home safety check at Mother's home. *Id.* at 118. At that time, there were no concerns in the home. *Id.* at 118. However, Mother informed Ms. Burdett that she was not in treatment for either mental health or drug and alcohol abuse. *Id.* at 120. Mother claimed to be employed as a grocery store cashier and as a certified nursing assistant, but did not provide documentation. *Id.* Ms. Burdett encouraged Mother to provide documentation of housing, employment, and treatment, as well as what her daycare plans would be for Child. *Id.* Mother replied that she had

"friends" lined up. *Id.* Ms. Burdett informed Mother that she would have to provide information for background checks for Child's caretakers. *Id.* Mother never provided this information. *Id.*

Mr. Duncan, a caseworker for the Agency, testified that from the January 2019 hearing through the May 2019 hearing, Mother had her own residence, and was drug testing through SOS when workers dropped Child off for visits. *Id.* at 56, 134. Mother only tested positive for drugs she was prescribed. *Id.* Mother informed Mr. Duncan that she was moving to Johnstown, Cambria County because she had a solid support system there. *Id.* at 135. Upon Mother's discharge from her latest treatment program, Mr. Duncan spoke with Kimberly Beaver, Mother's counselor, about her further recommendations for Mother's care. *Id.* Mother informed Mr. Duncan that she had made several phone calls to agencies in the area and had completed an intake in February 2019, but Mr. Duncan never received confirmation that she had done so. *Id.* at 136, 148. Mother also informed Mr. Duncan that she had met with a counselor at ACRP named Tessa, but, when Mr. Duncan called ACRP, no employee named Tessa existed. *Id.* To Mr. Duncan's knowledge, Mother was not involved in drug and alcohol treatment or mental health treatment after that time. *Id.* at 137. Mother continued to submit negative drug screens after the May 2019 hearing. *Id.* The last time Mr. Duncan spoke with Mother was the day prior to the termination hearing. *Id.* at 138. Mother stated she was able to keep her housing in Johnstown, but she did not provide proof of a rent receipt. *Id.*

Mr. Bowers testified that he is employed by the Butler County Adult Probation and Parole Department. N.T., 6/26/19, at 17. Mr. Bowers supervised Mother after she was sentenced for two DUIs in August 2018. *Id.* Although Mother was living in Cambria County, Pennsylvania, at the time, she was not contacting the probation department there, and the case was sent back and forth between Butler and Cambria counties until Mother was brought in for a probation violation hearing in June 2019 for failing to complete the terms of her house arrest. *Id.* at 17-19. Although Mother had originally been sentenced to intermediate punishment, a court revoked that sentence and resentenced Mother to thirty-two days to one year in prison. *Id.* Mr. Bowers believed Mother was due to be released July 15, 2019. *Id.*

Mr. Duncan testified that Mother did not provide any explanation as to why she had not checked in with Cambria County's probation and parole department. *Id.* at 138-39. Mother did not advise Mr. Duncan that she would be in need of child care during her parenting time or provide the name of any child care providers, and there was no explanation provided as to why SOS was leaving Child in the care of someone the Agency did not know and who had not been given a background check. *Id.* at 165-68.

Dr. Chambers testified that he is a licensed psychologist who conducted bonding assessments and a psychological examination of Mother in October 2018. *Id.* at 170-71, 179. Mother had an extensive mental health history which included inpatient treatment for suicidal ideation, as well as years of drug and alcohol addiction. *Id.* at 170-72. Mother also had a criminal history

with multiple DUIs in one month. *Id.* at 172. Personality testing conducted on Mother revealed significantly elevated levels on the scales of depression and antisocial behavior, and elevated levels of schizophrenia and social isolation. *Id.* at 175. These findings were consistent with Mother's extensive chronic mental health history. *Id.* Dr. Chambers believed that Mother was at high risk for relapse based upon her history. *Id.*

The trial court also heard conflicting testimony regarding Mother's apparent attempts to have Child left with unknown individuals in April of 2019. Mother testified that M.A. is a friend she met in recovery, and that "Brenda from SOS" told Mother that she could have M.A. watch Child so long as she had a photo identification. *Id.* at 238-39. Ms. Brenda Alter, the executive director at SOS, testified that, in April 2019, she was informed by one of her workers that Mother's boyfriend would be taking Child following Child's transportation for a visit. *Id.* at 208. Ms. Alter testified that she was "not okay" with that as she had not met this individual, and she contacted Mother's caseworker and Mother. *Id.* Mother told Ms. Alter that M.A. would be taking Child and that she did not have a boyfriend. *Id.* Ms. Alter contacted Mr. Duncan. *Id.* Ms. Alter testified that she spoke personally with Mr. Duncan. *Id.* at 215-16. Mr. Duncan indicated this would be fine as long as there was photo I.D. indicating that M.A. was who she said she was. *Id.* On April 6, 2019, Child was dropped off with M.A. *Id.* at 209.

Mr. Duncan denied approving of having Child left with M.A. *Id.* at 153-54. According to Mr. Duncan, he spoke with Ms. Alter, and she informed him

that Mother would not be present for Child's drop-off. He informed Ms. Alter that they would need additional information "so that [the Agency] can do what we need to do on our end." *Id.* at 153. Ms. Alter then left a message indicating that "[e]verything is good, we're good to go," which he took to mean that Mother had rearranged her schedule. Mr. Duncan stated that Ms. Alter and Mother provided him no additional information or names. *Id.* at 153-54.

Based on the foregoing review of the record, we find support for the trial court's findings that while Mother made progress in structured environments, she failed to complete her mental health goals and was unable to demonstrate an ability to maintain stability for herself and Child on her own. We acknowledge that Mother testified to her difficulties arranging for mental health treatment following her move to Cambria County and that she attempted to comply with the terms of her probation. However, the record supports the trial court's credibility determinations and findings of fact on this issue. Accordingly, this Court will not disturb them. Furthermore, based on the trial court's findings, we agree with Counsel's conclusion that an appeal of the trial court's ruling under Section 2511(a)(2) is frivolous.

### Section 2511(b)

Section 2511(b) provides:

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

It is well settled that "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Z.P.*, 994 A.2d at 1121. The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011); *see also In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super.

2008) (stating that the court may emphasize the safety needs of the child). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. *Id.* "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Here, the trial court observed:

This case, like so many others, underscores unfortunate and disheartening effect these actions may have on parents. However, the effect the action has on a parent cannot be used as a reason to set aside the best interest of a child where the parent has failed to fulfill his or her parental duties. The overwhelming need for the child to have timely permanency must be considered.

\* \* \*

While Mother may have a bond with Child, the mere existence of the bond between Mother and Child is not sufficient. This bond should be positive for [C]hild. Stability and family permanence are critical to the health and welfare of dependent [c]hildren. In considering this bond, the trial court must consider damage that may be done to the child by a prolonged, unhealth bond with a parent, especially as it may affect the child's ability to form attachments to foster families who could provide the necessary love, care and stability that the child needs.

In this case, Mother's long-term drug use, failure to seek appropriate mental health care, and inability to maintain stability has created significant negative consequences for Child. Mother['s] failure to understand the consequences of her choices makes the likelihood of her ability to develop an appropriate parental bond to enable her to provide Child with the necessary stability and permanency that she requires highly unlikely. Dr.

Chambers explained that Mother has a significant mental health history, with chronic anti-social behavior, and struggles with drug and alcohol problems. Specifically, Mother experiences significant issues with depression, anxiety, impulse control and a low frustration tolerance. Dr. Chamber[s] specifically opined that Mother . . . has a high potential for relapse, and that her subsequent incarceration for failure to communicate with the Cambria County Probation and Parole Office only provides further [support to] his opinion. Dr. Chambers explained that Mother's personal struggles concerning her mental health and significant potential for relapse will compromise her ability to effectively parent [C]hild. While Mother was able to maintain a drug-free lifestyle during the year prior to the hearing while primarily residing in a highly structured and supportive setting, her significant history of relapse, the most recent being March of 2018, combined with her significant mental health problems, and failure to accept responsibility for her actions, lead this [c]ourt to the inescapable [conclusion] that any negative consequences [C]hild may experience from the severance of any bond with Mother is greatly outweighed by her need for stability and permanency.

[C]hild's need for permanency and the close bond between [C]hild and the Kinship Placement Family outweigh any potential harm to [C]hild from the severing of Mother's parental rights. As stated above, the [foster family] have been [C]hild's parental figures since July 6, 2017. [C]hild has bonded with the [foster family] and has formed a family unit living in [the foster family's] home with their other two [children]. The [foster family] provide[s C]hild with the stability, love and support that Child needs. Moreover, the [foster family] are a pre-adoptive resource for [C]hild.

*See* Trial Ct. Op., 7/15/19, at 21-23 (citations omitted).

A review of the record reveals that Ms. Burdett observed Child interacting with her kinship foster parents. *Id.* at 121. Child seemed comfortable with her foster parents and sought them out for her needs. *Id.* at 122. Child has not visited with Mother since Mother's incarceration. *Id.* at 128.

Mr. Duncan testified that Child is receiving services solely for child preparation. *Id.* at 139. She is up to date medically and physically. *Id.* Child is doing well in school and is involved in gymnastics and other activities with her kinship family and their biological children. *Id.* at 140. Child seeks out her foster mother for her needs and for comfort and affection. *Id.* Child is very bonded with her foster siblings. *Id.* at 140-41.

Dr. Chambers testified that, in his observations, Mother's interactions with Child were appropriate and affectionate. *Id.* at 173. Mother did have a bond with Child, but her parenting ability was compromised by her history of mental health and drug and alcohol issues. *Id.* at 177. Dr. Chambers felt that Mother's personal struggles would compromise her capacity to effectively parent going forward and recommended that any eventual reunification be based upon Mother's maintenance of sobriety for a year and to engage in dual diagnosis treatment. *Id.* at 178-79.

Based on the foregoing, we discern no abuse of discretion in the trial court's conclusion that Child's needs and welfare are best served by termination. Moreover, we agree with Counsel's assessment that a challenge to the trial court's analysis of Section 2511(b) based on a failure to consider the nature and extent of bonding is frivolous.

**Reasonable Efforts**

In *In re D.C.D.*, 105 A.3d 662 (Pa. 2014), our Supreme Court concluded that neither Section 2511(a) nor (b) "requires a court to consider the

reasonable efforts provided to a parent prior to termination of parental rights."

***D.C.D.***, 105 A.3d at 672. Further, the Court explained:

> We also do not find reasonable efforts are required prior to termination when Section 2511 of the Adoption Act, entitled "Grounds for termination," is read in conjunction with Section 6351 of the Juvenile Act, entitled "Disposition of dependent child." . . . Instead of a requirement to provide reasonable efforts prior to the filing of a termination petition, Section 6351 actually creates an exception that excuses the filing of an otherwise required termination petition, as explained below.
>
> \* \* \*
>
> Accordingly, while reasonable efforts should be considered and indeed, in the appropriate case, a trial court could insist upon their provision, we hold that nothing in the language or the purpose of Section 6351(f)(9) forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent.

***Id.*** at 672–75.

Instantly, it appears that Counsel raises this issue as a challenge to the trial court's dependency ruling rather than the termination ruling. However, as our Supreme Court has made clear, an agency's failure to provide reasonable efforts will not prevent the trial court from granting a petition to terminate a parent's rights under Section 2511(a)(2) or (b). ***See id.*** In any event, we agree with the trial court that the record does not support a claim that the Agency's efforts were unreasonable under the circumstances of this case. ***See*** Trial Ct. Op., 11/12/19, at 34-36. Accordingly, this issue is frivolous.

## Conclusion

- 45 -

Having reviewed the issues raised by Counsel in her amended *Anders*/*Santiago* brief, we agree that Mother's intended issues in this appeal are frivolous. Our independent review also reveals no issues of arguable merit. Accordingly, we affirm the order terminating Mother's parental rights and grant Counsel's petition to withdraw.

Order affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2021